# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| EDWARD FERGUSON and | : | |
| ANTHONY GREEN, | : | CIVIL ACTION |
|   Plaintiffs, | : | |
| | : | NO. 05-0451 |
|     v. | : | |
| | : | |
| MERCK & CO., INC., | : | |
|   Defendant. | : | |

## Memorandum and Order

YOHN, J.                                                                 January_____, 2008

Plaintiffs Edward Ferguson and Anthony Green bring this employment discrimination action against Merck & Co., Inc. Plaintiffs' claims are brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.*, and 42 U.S.C. § 1981. Currently pending is Merck's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 as to Ferguson's claims. Merck has argued Ferguson's disparate impact claim and his hostile work environment claim should both be dismissed, but Ferguson has responded that he is only pursuing a hostile work environment claim (although as to both statutes). Because Ferguson chooses to proceed only on the hostile work environment basis, I will only address Merck's arguments as they pertain to the hostile work environment claims.

For the reasons discussed herein, I will grant Merck's motion as to Ferguson's Title VII claim and will deny it as to Ferguson's § 1981 claim. Judgment will be entered in favor of Merck and against Ferguson on Ferguson's Title VII claim.

1

I.      **Factual and Procedural Background**

   A.      **Factual Background**[1]

Defendant Merck is a global pharmaceutical company that discovers, develops, manufactures, and markets vaccines and medicines. (Def. Statement Undisputed Facts ¶ 1; Pl. Statement Undisputed Facts ¶ 1.) Merck's Manufacturing Division ("MMD"), where the events related to this lawsuit took place, is located in West Point, Pennsylvania. (*See* Def. Statement Undisputed Facts ¶ 1; Pl. Statement Undisputed Facts ¶ 1.)

Plaintiff Edward Ferguson began working for Merck in July 1994 as a security guard. (Edward Ferguson Dep., 33:7-16, 34:11-13, 40:14-15, Sept. 28, 2006, Nov. 28, 2006 & Dec. 15, 2006.) Ferguson has provided examples of various actions by Merck supervisors or employees that took place between 1994 and 2005, which he argues created a racially hostile work environment at Merck.

   1.      **Lieutenant Position Promotion**

Ferguson points to the promotion of a white employee to the lieutenant position shortly after Ferguson's hire as evidence of Merck's racial discrimination in job assignments. When Ferguson initially interviewed for the security guard position in 1994, there were no lieutenant positions, which have a higher rank and salary, available. (*Id.* at 40:14-19, 43:9-21.) While

---

[1] The account contained in this section is comprised of both undisputed facts and Ferguson's factual allegations, and all facts and inferences are viewed in the light most favorable to Ferguson, the nonmoving party. *See Skoczylas v. Atlantic Credit & Fin., Inc.*, No. 00-5412, 2002 WL 55298, at *2 (E.D. Pa. Jan. 15, 2002) ("When considering a motion for summary judgment, a court must view all facts and inferences in a light most favorable to the nonmoving party."); *see also Brown v. Muhlenberg Twp.*, 269 F.3d 205, 208 (3d Cir. 2001) (citing *Beers-Capitol v. Whetzel*, 256 F.3d 120, 130 n.6 (3d Cir. 2001)) (viewing facts on appeal of summary judgment "in the light most favorable to the [nonmoving parties], drawing every reasonable inference in their favor").

Ferguson was in the interview process, the director of the security department explained the

positions in the department to him and stated that a lieutenant position might open up in the

future.  The director told Ferguson he could wait and interview for the lieutenant position, but the

security guard position might be filled in the interim.  (*Id.* at 40:14-19, 41:6-43:8.)  Ferguson

chose to pursue the open security guard position, and Merck hired him for this position.  (*Id.* at

34:11-13, 41:17-22, 43:3-16.)

A lieutenant position became available later in 1994 when one of the lieutenants retired.

(*Id.* at 41:6-13.)  Ferguson did not apply for that position, but he believes that he did not have the

same opportunity to advance as a white employee who was promoted to the lieutenant position.

(*Id.* at 41:14-16, 57:3-8.)  The white employee who was promoted knew when he was hired that

he would be promoted when a lieutenant position became available.  (*Id.* at 45:20-46:3, 48:7-13.)

Ferguson never expressed interest in the lieutenant position, and he does not have direct evidence

that this decision to promote the white employee instead of Ferguson was based on race; he just

felt that the filling of this lieutenant position was based on race.  (*Id.* at 52:1-5, 52:17-53:9,

57:15-17.)

### 2.      Harassment by Leigh Anne Carroll and Ryan Sloyer

Ferguson successfully bid to become a filler in Department 285, a part of MMD, in

December 1994.  (*Id.* at 59:1-7.)  The transfer to the filler position included a labor grade transfer

and salary increase, but Ferguson did not consider the transfer and salary increase to be a

promotion.  (*Id.* at 61:4-16.)  His primary job responsibility as a filler was inspecting vials of

vaccine.  (*Id.* at 61:23-62:8.)  Ferguson's direct supervisor in Department 285 was Leigh Anne

Carroll, and James Murphy was the department's senior supervisor.  (*Id.* at 61:17-22, 296:4-13.)

While Ferguson was a filler, another African American employee was training Ferguson. (*Id.* at 100:2-7, 100:13-14.)  During a demonstration, Ferguson's coworker accidently squirted alcohol into her eye.  (*Id.* at 100:15-18.)  When Ferguson reported the incident to Carroll, he told her that the coworker had been wearing goggles when the accident occurred, but Carroll suggested that she did not believe Ferguson.  (*Id.* at 101:9-102:7.)  Although Carroll did not say anything overtly racist, Ferguson believed she was implying that he would lie for his black coworker.  (*Id.* at 130:14-131:24.)  Carroll began harassing Ferguson after that incident.  (*Id.* at 102:9-10.)

One example of harassment by Carroll took place when Ferguson was loading a bulk container of vaccines into a freezer.  (*Id.* at 103:1-3.)  Carroll ordered Ferguson to throw away the bulk container, but Ferguson believed the vaccines should not be thrown out and questioned Carroll's order.  (*Id.* at 103:5-11.)  Carroll answered:  "[Y]ou heard me.  Throw it away."; and "I told you, just do what you're told."  (*Id.* at 103:9-13.)  Carroll then abruptly changed her mind and ordered Ferguson not to throw the vials away.  She did not explain her behavior or apologize for it.  (*Id.* at 103:17-104:2.)  Ferguson thought this behavior was racially motived and a personal attack against him.  (*Id.* at 293:7-294:9.)

During another incident, Ferguson was working at a table full of vaccine, which was a safety hazard because the table was only supposed to be half full.  (*Id.* at 104:3-6, 106:3-5.)  Ferguson was not responsible for this safety hazard.  (*Id.* at 104:15-20.)  Carroll was standing on the other side of a glass window, and when she saw Ferguson standing at the full table, she started "banging on the window" and yelling at Ferguson.  (*Id.* at 104:10-105:16)  A white employee, Ryan Sloyer, joined Carroll in yelling at Ferguson, and Ferguson believes Sloyer acted

4

because of Ferguson's race and Sloyer instigated the incident in order to encourage Carroll's action.  (*Id.* at 104:21-22, 106:8-107:24.)

On one occasion in 1995, Ferguson's daughter was ill.  (*Id.* at 270:12-20, 274:8-10.)  He received permission from Keith Fryling, another supervisor, to use the telephone in the supervisors' office to make a personal call during his break.  (*Id.* at 274:14-24.)  When Carroll saw Ferguson on the phone, she hung up the phone Ferguson was using and said, "[Y]our break is almost over.  You can't use the phone."  (*Id.* at 275:2-6.)  Ferguson still had five to seven minutes left of his break, and white employees continued using other telephones in the supervisors' office, but Carroll did not require them to get off the phone.  (*Id.* at 275:7-18.)  Ferguson also saw white employees using the supervisors' phones on various other occasions.  (*Id.* at 277:13-279:18.)

In August 1995, Ferguson became a general worker in Department 285.  (*Id.* at 67:11-14.)  This position paid more than the filler position and also had more responsibilities.  (*Id.* at 67:18-68:9)  Part of Ferguson's job responsibilities included working on the production line for the bulk vaccine product, working on the filling lines, and maintaining documentation of the process.  (*Id.* at 69:4-70:8.)  Ryan Sloyer, who was the shop steward at that time, trained Ferguson when he became a general worker.  (*Id.* at 108:5-7, 109:4-12.)  During the training Sloyer told him, "[Y]ou can't do the things I can do."  (*Id.* at 108:8-10.)  Ferguson asked if it was because he was the shop steward and Ferguson was not, but Sloyer responded that was not the reason.  (*Id.* at 108:10-12.)  Ferguson then asked if it was because he was black, and Sloyer responded, "you know why."  (*Id.* at 108:13-14.)

5

### 3.      Harassment by James Murphy

Other incidents of harassment involved the senior supervisor of Department 285, James Murphy. At one point in 1995, Ferguson noticed that the wrong "packer" of vaccine had been set up on the line. (*Id.* at 295:21-24, 296:16-297:8.) He did not create the error, but he was trying to remedy the mistake, and he asked Murphy how it should be corrected. (*Id.* at 297:6-12.) Murphy walked aggressively across the room to look at the packers. (*Id.* at 297:16-24.) Murphy cursed and pushed Ferguson in the back, causing Ferguson to fall into a table. (*Id.* at 298:6-14.) Ferguson states that Murphy was "in a hurry" and looked "angry" and believes that, based on his prior experiences with Murphy, Murphy's physical push was deliberate and racially motivated. (*Id.* at 305:11-21, 308:13-23.)

In 1995 or 1996, other employees were disciplined for violating Merck's work rules. (*Id.* at 325:6-9.) On some occasions, Ferguson would speak up for other employees he thought were being inappropriately disciplined. (*Id.* at 78:5-11, 86:12-15.) During one incident, Ferguson was present while Murphy chastised another employee for violating a rule. (*Id.* at 86:1-5.) Ferguson did not speak up about the discipline, but Murphy told him something to the effect of, "[I]f you cross me, I'm going to, you know, I'll do the same thing to you."; or "[Y]ou don't want to cross me." (*Id.* at 86:6-11.) Murphy would make comments like this to Ferguson a few times a month. (*Id.* at 325:1-3.)

On December 10, 1996, Ferguson approached Murphy in the morning and told Murphy that he was not feeling well. (*Id.* at 336:6-14.) Murphy told Ferguson that he looked okay and then walked away. (*Id.* at 361:3-17.) Ferguson interpreted this to mean that Murphy would not allow him to go to Health Services. (*Id.* at 361:18-20.) He planned to go to Health Services

6

during his break, but when his break time arrived, he was too weak to walk there.  (*Id.* at 337:1-9, 338:6-20.)  Later that same morning, Ferguson told Murphy he needed to go to Health Services, and Murphy gave him permission to go.  (*Id.* at 338:22-339:5.)  Ferguson was then taken to the hospital and was eventually diagnosed with a heart condition, for which he now takes medication.  (*Id.* at 342:20-24.)  Ferguson believes this incident demonstrates that concessions are made for white employees' health problems, but not for African American employees' problems.  In further support of this claim, Ferguson points out that Larry Beck, a white employee who suffered the effects of a chemical residue on his lungs, was promoted to supervisor.  (*Id.* at 340:13-18, 362:4-363:15.)  Additionally, Liz Striker, a white employee who had skin cancer, was given special accommodations at work.  (*See id.* at 340:8-12, 341:13-342:12.)

Another incident Ferguson uses to demonstrate the racially hostile work environment at Merck pertains to the cleaning of safety masks.  The safety masks worn by Merck employees have a shroud attached to the protective masks.  The procedure is to flip the shroud up when the mask is dirty and flip the shroud down when the mask is clean so employees are not exposed to chemicals by wearing unclean masks.  (*See id.* at 549:19-24.)  On a couple of occasions between 1996 and 1998, Ferguson observed Murphy flipping the shrouds down, even though Murphy knew the masks were dirty.  (*Id.* at 549:19-550:6, 550:24-551:4.)  Ferguson believes Murphy was racially discriminatory in not following the safety protocols because Murphy was able to assign who went into the Mustargen core room (the "core"), and therefore who used the dirty masks. (*Id.* at 557:14-23.)

On one occasion after Ferguson observed Murphy flipping down the shrouds on dirty masks, Ferguson asked Murphy if the masks were actually clean.  Murphy then had the masks

cleaned.  (*Id.* at 554:7-555:9.)  After this incident, Ferguson suggested to Area Head Keith

Fryling that they keep a log of when masks were cleaned, and Fryling adopted this suggestion

and implemented a log procedure.  (*Id.* at 556:5-8, 557:1-8.)

     Ferguson became a shop steward for the third shift in 1998.  (Def. Statement Undisputed

Facts ¶ 43; Pl. Statement Undisputed Facts ¶ 43.)  Murphy had allowed the prior third-shift shop

steward, Sloyer, to organize the overtime shifts for all of the employees on all shifts.  (Ferguson

Dep. 109:20-111:3. )  Murphy refused to pass those responsibilities on to Ferguson when

Ferguson became the shop steward.  (*Id.* at 111:13-112:2, 117:16-21.)  This refusal differentiated

from the usual procedure at MMD, which was to allow a shop steward who wanted to schedule

overtime to do so.  (*Id.* at 115:3-14.)  Despite this practice, Ferguson admits that there was no

work or union rule which dictated that the shop steward be responsible for scheduling overtime.

(*Id.* at 115:15-17.)  Additionally, the shop stewards for the first and second shifts were not given

these responsibilities while either Sloyer or Ferguson was the third-shift shop steward.  (*Id.* at

118:7-119:7.)

     Beginning in 1996 or 1997 and continuing into 1998, Ferguson heard white employees

refer to Murphy as the "zookeeper."  (*Id.* at 383:15-20, 385:18-21, 386:4-13.)  In 1998, other

employees then heard Murphy refer to himself as the "zookeeper."  (*Id.* at 383:1-8, 385:21-22.)

Ferguson considered Murphy's reference to himself as a "zookeeper" to be a specific racial

remark.  (*Id.* at 388:11-22.)  Ferguson pulled Murphy aside and told him that type of remark is

offensive.  (*Id.* at 385:5-7.)  Although Murphy looked at Ferguson when Ferguson spoke with

him, he did not reply to Ferguson.  (*Id.* at 385:7-8.)  Ferguson does not recall Murphy making

8

those remarks again, however.[2]  (*Id.* at 399:5-20.)

      Murphy sent an e-mail message to other supervisors in Department 285 on July 14, 1998. The relevant portion of the e-mail stated:  "I HAVE SCHEDULED ADDITIONAL VACATION FOR THE FOLLOWING DATES.  PLEASE ARRANGE COVERAGE SO MY ANIMALS WILL FEEL ATTENDED.  PLEASE NO RAW MEAT THIS TIME!  I HAD A HECK OF A TIME GETTING THEM BACK ON A DRY FOOD DIET THE LAST TIME YOU GUYS COVERED FOR ME."  (Pl. Mem. Opp'n to Def. Mot. for Summ. J. Ex. 5.)  On August 7, 1998, Murphy sent this e-mail two more times to "outside" supervisors who would substitute for him while he was on vacation and to "inside" supervisors who oversaw different employees and could not cover for him while he was on vacation.  (James Murphy Dep., 154:5-25, Feb. 1, 2001.)

      Keith Fryling asked Murphy to apologize to the third-shift employees and tell them what the e-mail contained.  (Keith Fryling Dep., 94:4-14, Nov. 14, 2004.)  On August 12, 1998, there was a meeting for the fillers and Lyo-Material Coordinators ("LMCs").  (Ferguson Dep. 399:23-24.)  Murphy specifically told the third-shift fillers and LMCs, who were African American, the meeting pertained to them, but he told the mechanics, who were white, the meeting did not concern them.  (*Id.* at 400:14-17, 402:1-12.)  Murphy invited only the fillers and the LMCs because they were the only ones who directly reported to him.  (Murphy Dep. 206:22-25.)

      During the meeting, Murphy apologized to the fillers and LMCs for sending an e-mail he described as humorous, but he refused to answer an employee's request to describe the contents of the e-mail.  (Ferguson Dep. 400:1-3, 400:14-17, 405:12-17.)  Ferguson then learned from a

---

[2] Similarly, on several occasions Ferguson overhead white employees asking another African American employee if he climbed trees and ate bananas.  (Ferguson Dep. 389:8-391:4.)

coworker that the e-mail referred to African Americans as animals, but he was not shown a copy of the e-mail until later.  (*Id.* at 402:13-18, 404:8-11, 405:18-21.)  Ferguson was upset after the meeting, and he and other shop stewards requested a meeting with other directors to discuss the e-mail.  (*Id.* at 403:11-21, 405:18-406:17.)  Ferguson also drafted a grievance concerning the meeting and e-mail that twenty-seven other employees signed.  (*Id.* at 403:11-21, 408:8-23; Pl. Mem. Opp'n to Def. Mot. for Summ. J. Ex. 7.)  Merck initiated an investigation of the incident, (Fryling Dep. 99:17-100:4), but the record does not contain information about the outcome of the investigation.

### 4.    Denial of Labor Grade Increase for Lyo-Material Coordinators

Ferguson also states Merck created a racially hostile work environment by denying a pay increase to a group of African American employees while approving a pay increase for a group of white employees.  Sometime in 1997 or 1998, Merck changed the general worker title to the title of Lyo-Material Coordinator.  Ferguson was a general worker at that time and became an LMC.[3] Ferguson and another shop steward then applied for a labor grade and pay increase for the LMCs, who were African American.  (Ferguson Dep. 516:1-4, 518:4-11.)

The decision whether to change a labor grade is based on a variety of factors, including the nature and difficulty of the job, the duties required of the position, and whether there have been significant changes in the responsibilities.  (*Id.* at 518:16-24.)  Some of the LMCs had taken on new responsibilities and had received training from their department, and Ferguson requested the labor grade increase because of this.  (*Id.* at 516:23-517:3.)  In 1998, Merck denied the

---

[3] Merck contends that when Ferguson's job title changed his responsibilities increased slightly.  (Def. Statement Undisputed Facts ¶ 6.)  Ferguson argues that his responsibilities increased significantly when he became an LMC.  (Pl. Statement Undisputed Facts ¶ 6.)

request to increase the labor grade of the LMCs because it believed there had not been a significant increase in the LMCs' responsibilities to merit an increase.  (*Id.* at 525:2-6; Def. Statement Undisputed Facts ¶ 17; Pl. Statement Undisputed Facts ¶ 17.)  In contrast to the LMCs, the labor grade of the mechanics in Department 285, who were white, was upgraded. (Ferguson Dep. 516:12-22.)  According to Ferguson, the mechanics did not have any new responsibilities to merit an increase and there were not substantial educational differences that would have justified the increase.  (*Id.* at 521:18-21.)  The mechanics, licensed trade workers, had to fulfill educational requirements before being hired.  (*Id.* at 519:16-520:16.)  In contrast, the LMCs were trained on the job.  (*Id.* at 520:1-16.)

### 5.    Harassment by Bernard Willis

Ferguson's examples of harassment also include harassment by Bernard Willis, another supervisor at Merck.  Ferguson became a Filler–Lyo Products in June 2000. (Def. Statement Undisputed Facts ¶ 7; Pl. Statement Undisputed Facts ¶ 7.)  Ferguson's responsibilities as a Filler–Lyo Products were similar to the responsibilities he had as a filler in 1994.  (Def. Statement Undisputed Facts ¶ 7; Pl. Statement Undisputed Facts ¶ 7.)  Willis was the department manager in 2000.  (Ferguson Dep. 467:12-14.)

Ferguson was inadvertently overpaid by approximately $400 in October 2000.  (Def. Statement Undisputed Facts ¶ 57; Pl. Statement Undisputed Facts ¶ 57; Ferguson Dep. 139:16-19.)  He did not immediately realize that a mistake had been made, and on three separate occasions, Willis asked Ferguson if he was certain he did not know why he had been overpaid. (Ferguson Dep. 139:19-140:2)  Ferguson considered this questioning to be harassment because of the number of times Willis questioned him and because Willis insinuated he had intentionally

been overpaid, but he admits Willis did not say anything about Ferguson's race during these conversations, or at any other time.  (*Id.* at 140:3-13.)

When Ferguson realized the overpayment was a mistake, he reported it to the Human Resources department.  (*Id.* at 140:5-7, 489:17-21.)  He asked both Willis and the Human Resources department to investigate the mistake to determine how it happened, but they declined to do so.  Ferguson believes their failure to investigate the cause of the overpayment suggests a conspiracy and discrimination.  (*Id.* at 490:8-14, 492:11-19.)  When a Human Resources representative denied Ferguson's request, however, the representative did not use any racially charged language.  (*Id.* at 492:11-493:5.)

On December 6, 2000, one of Ferguson's supervisors (Ferguson does not recall the name or the race of the supervisor), told Ferguson and some of his coworkers to enter the core.  (*Id.* at 466:2-15.)  After the supervisor made this request, Ferguson, his supervisor, and his coworkers had a lengthy discussion about the safety of the core.  (*Id.* at 467:8-12.)  Earlier chemical readings in the core showed that it had exceeded the acceptable level of chemicals.  (*Id.* at 464:8-16.)  Therefore, Ferguson wanted to know whether the testing and retesting that had been suggested by a representative from Industrial Safety and Hygiene had been completed.  Ferguson requested that the testing and retesting be completed before he entered the core.  (*Id.* at 464:17-20, 467:8-12.)  Willis then approached the group and told Ferguson that he would consider sanctioning him for insubordination if he did not enter the core.  (*Id.* at 467:12-15.)  Ferguson understood that a sanction for insubordination could include termination, so he decided to enter

12

the core.[4]  (*Id.* at 490:10-19.)  Willis told Ferguson that the room had been cleaned three separate times in the months that had passed since the reading had shown elevated chemical levels in the core.  (*Id.* at 478:20-23.)  Ferguson, Len Conners (a white coworker), Ray Bird (an African American coworker), Ferguson's supervisor, and Willis then entered the core together.  (*Id.* at 478:24-479:16.)

### 6.     Harassment by Barbara Grofic

Ferguson also alleges harassment by supervisor Barbara Grofic, beginning sometime between 2001 and 2003.  (Def. Statement Undisputed Facts ¶ 77; Pl. Statement Undisputed Facts ¶ 77.)  On one occasion, after Ferguson had asked for and received permission from his supervisor to take personal time off from work, Grofic questioned Ferguson as to why he was leaving work early.  (Ferguson Dep. 195:11-196:15.)  On another occasion in 2005, Ferguson spoke with Grofic about overtime, and she responded, "you people are overpaid for the amount of education you have."  (*Id.* at 197:13-198:1.)  Ferguson admits, however, that Grofic never made any racial comments to him.  (*Id.* at 203:24-204:2; Pl. Statement Undisputed Facts ¶ 77.)  Moreover, he acknowledges that white employees also complained about the way Grofic treated them.  (Ferguson Dep. 204:10-206:7, 207:3-209:7.)

### 7.     Additional Incidents

In 1997, flyers advertising a Ku Klux Klan meeting were placed on five vehicles parked in Merck's parking lot.  (*Id.* at 565:23-566:6.)  A flyer was not placed on Ferguson's car, but at

---

[4] Maurice Lee, one of Ferguson's African American coworkers, decided to go to Health Services instead of entering the core at that time.  (Ferguson Dep. 470:4-8.)  Ferguson did not go to Health Services because he believed the policy on which Lee was relying did not actually allow them to report to Health Services prior to entering the core.  (*Id.* at 471:19-472:22.)

least one of the recipients was African American.  (*Id.* at 567:5-22.)  Ferguson learned about the flyer incident through word of mouth within a couple of weeks of the incident.  (*Id.* at 566:7-23.)  Merck investigated the incident, (*id.* at 567:2-6), but the record does not contain any additional information about the investigation or the outcome of the investigation.

In 1999 or 2000, African American employees were disciplined for not following Merck's safety rules, even though they were acting according to the directions given by their white supervisors.  (*Id.* at 53:11-12, 537:1-24, 540:1-22.)  Although Ferguson admits he has no reason to believe the committee that imposed the discipline knew of the supervisors' accountability, he contends that the committee should have listened to and investigated the testimony of the approximately ten African American employees who said they were following their white supervisors' instructions.  (*Id.* at 540:7-17, 541:12-19.)

In February 2000, Ferguson sent a letter to Jim Randcourt in Human Resources and to Dennis Celantano, executive director of Building 29, alleging "loose conduct" in the building, including time-card theft, stealing, and trash being left around.  (*Id.* at 153:6-14, 159:4-16; Def. Mem. in Support of Mot. for Summ. J. Ex. B., Letter from Ferguson, Feb. 18, 2000.)  When Randcourt and Celantano met with Ferguson to discuss the letter, Ferguson also mentioned "housekeeping" problems, including dirty refrigerators and break rooms, gnats in the men's shower, and food particles and garbage in the hallways .  (Ferguson Dep. 157:21-24, 169:14-22.)  Celantano told Ferguson they had begun painting the building's exterior, but Ferguson contends that the interior walls remained a problem.  (*Id.* at 173:5-13.)  Neither Randcourt nor Celantano said or did anything overtly racial, but Ferguson believes they did not take his complaints seriously because he is African American.  (*Id.* at 172:9-173:1.)

14

B.      **Procedural Background**

Allegations of racial discrimination against Merck were initially part of a proposed class action, which began on July 6, 1998, when Julius Webb and Ernest Thomas, two Merck employees, filed charges with the Equal Employment Opportunity Commission ("EEOC"). Webb, Thomas, and eighteen other named plaintiffs then filed a class action lawsuit against Merck on January 27, 1999.  Ferguson was a putative member of the class proposed in this action.[5]  The Honorable Charles Weiner denied class certification in *Webb v. Merck & Co., Inc.* on April 1, 2002.  *See* 206 F.R.D. 399 (E.D. Pa. 2002).  The Third Circuit denied permission to appeal the denial on June 18, 2002.  Six individual cases with class allegations in their complaints were filed in the interim, or shortly thereafter, and were before Judge Weiner after he denied the *Webb* class certification.[6]  Judge Weiner granted Merck's motion to strike the class allegations from these complaints on January 6, 2004.  *See Thompson v. Merck & Co., Inc.*, No.

---

[5] The class included:  "All black employees who work (or former employees who have worked since January 1, 1989) for Merck & Co., (a) in the Merck Manufacturing Division ("MMD") at a plaint in Pennsylvania, New Jersey or Georgia, or (b) as a Merck sales representative in the Mid-Atlantic Regional Business Group ("MARBG") of Merck's United States Human Health Division[] ("USHH")."  *Webb v. Merck & Co., Inc.*, 206 F.R.D. 399, 401 (E.D. Pa. 2002).

[6] These six additional cases included:  (1) *Thompson v. Merck & Co., Inc.*, No. 01-1004, filed February 28, 2001 by an employee of the Merck-Medco facility in Las Vegas, Nevada; (2) *Rodgers v. Merck & Co., Inc.*, No. 01-1328, filed March 20, 2001 by an Illinois resident who was a Professional Sales Representative for the B-Team; (3) *Cates v. Merck & Co., Inc.*, No. 01-3011, filed June 18, 2001 by an Illinois resident who was a Specialty Representative in the North Central Region Business Group of Merck's United States Human Health Division; (4) *Martin et al. v. Merck & Co., Inc.*, No.-01-6029, filed December 3, 2001 by employees of Merck's Stonewall plant in Virginia; (5) *Chisom & Dixon v. Merck & Co., Inc.*, No. 02-1196, filed March 8, 2002 by two employees of Merck's headquarters in Whitehouse Station, New Jersey; and (6) *Stith v. Merck & Co., Inc.*, No. 02-4176, filed June 27, 2002 by an employee of Merck's Rahway, New Jersey facility.

15

01-1004, 2004 WL 62710 (E.D. Pa. Jan. 6, 2004).

Ferguson filed his EEOC charge on June 26, 2004, alleging he suffered racial discrimination and harassment at Merck from July 1994 through December 6, 2000.  His EEOC charge specifically alleged that Murphy had repeatedly referred to him and his coworkers as animals and that Willis placed him in a dangerous situation in 2000 when Ferguson was ordered to enter the core.  The EEOC issued a right-to-sue letter to Ferguson on November 4, 2004, and Ferguson filed a complaint in federal court on February 1, 2005.  Ferguson's case was then consolidated with Green's case, and they filed an amended complaint on December 6, 2006.  Merck filed the instant motion for summary judgment on Ferguson's Title VII and § 1981 claims on April 27, 2007.  After initial briefs on the motion, Ferguson filed a motion to raise new issues, primarily pertaining to the timeliness of his claims, that were not addressed in the initial briefs.  I granted that motion, and the parties subsequently provided additional briefs focusing on the timeliness issues.

## II.    Legal Standard

Either party to a lawsuit may file a motion for summary judgment, and it will be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of showing that there is no genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met its initial burden, the nonmoving party must present "specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "Facts

16

that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Ideal Dairy Farms, Inc. v. John Lebatt, Ltd.*, 90 F.3d 737, 743 (3d Cir. 1996) (citation omitted). The nonmovant must present concrete evidence supporting each essential element of its claim. *Celotex*, 477 U.S. at 322-23.

When a court evaluates a motion for summary judgment, "[t]he evidence of the non-movant is to be believed." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Furthermore, "[a]ll justifiable inferences are to be drawn in [the nonmovant's] favor." *Id*. "Summary judgment may not be granted . . . if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed." *Ideal Dairy*, 90 F.3d at 744 (citation omitted). However, "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment." *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990) (citation omitted). The nonmovant must show more than "[t]he mere existence of a scintilla of evidence" for elements on which he bears the burden of production. *Anderson*, 477 U.S. at 252. Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted).

III.    **Discussion**

   A.    **Timeliness of Ferguson's Title VII Claim**

Federal courts lack jurisdiction to hear Title VII claims unless the plaintiff has filed a claim with the EEOC. *Woodson v. Scott Paper Co.*, 109 F.3d 913, 926 (3d Cir. 1997). A plaintiff in Pennsylvania must file a charge with the EEOC within 300 days of the employer's

alleged discriminatory action.  42 U.S.C. § 2000e-5(e); *see also EEOC v. Commercial Office Prods.*, 486 U.S. 107, 110 (1998); *Woodson*, 109 F.3d at 926.  The plaintiff must file the federal lawsuit within ninety days of receiving a right-to-sue letter from the EEOC.  42 U.S.C. § 2000e-5(f)(1); *Burgh v. Borough Council of Montrose*, 251 F.3d 465, 470 (3d Cir. 2001).

Merck argues Ferguson's Title VII Claim is time barred because he did not allege any racially discriminatory incidents later than 1998, and he did not file his EEOC charge until June 26, 2004, well after the 300-day limit.  Moreover, Merck argues, even if the *Webb* class action tolled the statute of limitations, the statute of limitations began to run again on April 1, 2002, when class certification was denied in *Webb*.  Merck concludes that because the EEOC charge was still not filed within 300 days of the denial of class certification, it is untimely.

Ferguson initially admitted that his EEOC charge was not timely, but he argued this untimeliness did not bar his claim because under the single-filing rule, Anthony Green's timely filed EEOC charge put Merck on notice of the claims and made Ferguson's EEOC charge superfluous.  Then, in his surreply Ferguson submitted evidence of six complaints that were on Judge Weiner's docket after class certification was denied in *Webb*.  These six complaints contained class-based allegations, and Ferguson argues that these complaints were subsequently proposed class actions and he was a putative member of some of the proposed classes; therefore, the statute of limitations continued to be tolled until January 6, 2004, when Merck's motion to strike the class-based allegations from these complaints was granted.  Because he filed his EEOC charge on June 26, 2004, he argues, his charge was timely and his Title VII claim can proceed.

Merck responds that the second proposed class actions do not toll the statute of limitations because the *Webb* class certification denial was a final decision on the merits, and

even if it was not, Ferguson was not a putative member of the subsequently proposed classes. Further, Merck argues, even if Ferguson had been a member of the proposed classes, he cannot piggyback the class actions in order to make his claim timely.

The exhaustion and filing requirements of Title VII are non-jurisdictional prerequisites to filing a lawsuit and are subject to waiver, estoppel, and equitable tolling principles. *See Commc'ns Workers of Am. v. N.J. Dep't of Pers.*, 282 F.3d 213, 216-17 (3d Cir. 2002) (citing *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982)).  Courts may evaluate the propriety of applying these equitable doctrines, but the doctrines should be applied sparingly. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).  Using these doctrines, the first issue on the timeliness of Ferguson's Title VII claim is whether the existence of six additional complaints after *Webb* with class-based allegations continued to toll Ferguson's statute of limitations until the date the class allegations were struck from the complaints.  Because I conclude that they did not, the issue then becomes whether the single-filing rule applies to make Ferguson's Title VII claim timely.  As discussed below, I conclude that the single-filing rule is not applicable here.  Viewing the charge in the light most favorable to Ferguson, the last discriminatory act Ferguson alleged in his EEOC charge took place on December 12, 2000, and Ferguson did not file his EEOC charge until June 26, 2004.  Therefore, because Ferguson did not file his EEOC charge within 300 days of the last discriminatory action alleged in the charge, Ferguson's Title VII claim is time barred.

### 1.    Tolling

Under the standard set in *American Pipe & Construction Co. v. Utah*, "the filing of a class action complaint tolls the statute of limitations for all members of the putative class who,

following the denial of certification, intervene or file an independent action." *McKowan Lowe &*
*Co., Ltd. v. Jasmine, Ltd.*, 295 F.3d 380, 382 (3d Cir. 2002) (citing *Crown, Cork & Seal Co. v.*
*Parker*, 462 U.S. 345, 350 (1983); *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974)).
Ferguson was a putative member of the proposed *Webb* class action, and based on *American Pipe*
and *Crown, Cork & Seal*, the statute of limitations on his claims was tolled during the pendency
of class certification in *Webb*.

The *American Pipe* and *Crown, Cork & Seal* tolling rule does not, however, automatically
allow tolling until Merck's motion to strike class-based allegations from the six additional
complaints was granted.  The Third Circuit has determined that there is a difference in the
applicability of tolling in subsequent cases where class certification was originally denied
because the class representative was not an adequate representative and in subsequent cases
where certification was originally denied because there were deficiencies in the class.  Thus,
"*American Pipe* tolling applies to the filing of a new class action where certification was denied
in the prior suit based on the lead plaintiffs' deficiencies as class representatives, but . . .
*American Pipe* tolling does not apply where certification was denied based on deficiencies in the
purported class itself."  *Yang v. Odom*, 392 F.3d 97, 99 (3d Cir. 2004).

Ferguson does not address whether denial of class certification in *Webb* was due to class-
or representative-based deficiencies.  Instead, he focuses his argument on the date of the final and
adverse denial of class certification.  He contends that the April 2002 denial of class certification
was not a final denial of class certification, and the final and adverse denial of the class action did
not take place until January 2004, when Merck's motion to strike the class-based allegations
from the six other complaints was granted.

20

Although tolling continues until the court has made a final and adverse determination of the class claims, *see Yang*, 392 F.3d at 102 (citing *Edwards v. Boeing Vertol Co.*, 717 F.2d 761 (3d Cir. 1983)), the June 2002 Third Circuit decision denying permission to appeal in *Webb* was a final and adverse determination.  Nothing in the *Webb* opinion demonstrates that the denial of class certification was not a final and adverse determination on the class claims.  Indeed, Judge Weiner stated:  "Simply put, resolution of the merits of the claims would degenerate into an unmanageable plethora of multiple individual determinations for each individual proposed class member."  *Webb*, 206 F.R.D. at 406.  He also concluded:  "In sum, other than sharing the common position of being black employees of Merck, the plaintiff's allegations are discrete and individualized. . . . Plaintiffs have not fully satisfied the commonality and typicality requirements of Rule 23(a)."  *Id.* at 408.  What Ferguson has referred to as the second denial of class certification was actually the court's granting Merck's motion to strike class-based allegations from six additional complaints that were still before Judge Weiner after he denied class certification in  *Webb*.  *See Thompson*, 2004 WL 62710, at *2 ("Despite the length of time which has expired since these actions were filed, plaintiffs have never filed a motion for class certification in any of them.")  Thus, the *Webb* opinion was final and adverse.[7]

---

[7] With his surreply, Ferguson included an affidavit from one of the attorneys who represented the plaintiffs in the six complaints with class-based allegations on Judge Weiner's docket after he denied class certification in *Webb*.  Ferguson argues that the plaintiffs' attorneys had proposed subsequent class certifications, thereby demonstrating that the *Webb* opinion was not actually a final and adverse determination on the issue of class certification.  His reasoning is that Judge Weiner asked the plaintiffs' attorneys to submit additional affidavits when the attorneys later proposed smaller classes than those set forth in the complaints; thus, denial was not final and adverse until the class allegations were struck from the six remaining complaints.  The *Webb* opinion itself, however, demonstrates that denial of class certification was final and adverse, and it is the *Webb* opinion which controls the outcome here.

Furthermore, an analysis of the classes proposed in the six additional complaints shows that these proposed classes did not continue to toll the statute of limitations on Ferguson's claims until Judge Weiner struck the class allegations from those complaints. *Thompson* brought a claim "on [Thompson's] own behalf, and on behalf of a class consisting of all African-Americans who have been employed or were denied employment by Merck and/or Merck-Medco at any time during the liability period."[8] (Compl. ¶ 11, E.D. Pa. No. 01-1004.) *Rodgers* also brought a claim "on [Rodgers's] own behalf, and on behalf of a class consisting of all African-Americans who have been employed or were denied employment by Merck at any time during the liability period." (Compl. ¶ 10, E.D. Pa. No. 01-1328.) *Cates*'s claim was identical; it was brought "on [Cates's] own behalf, and on behalf of a class consisting of all African-Americans who have been employed or were denied employment by Merck at any time during the liability period." (Compl. ¶ 10; E.D. Pa. No. 01-3011.) The *Martin* plaintiffs also filed the claim "on their own behalf, and on behalf of a class consisting of all African-Americans who have been employed or were denied employment by Merck at any time during the liability period." (Compl. ¶ 16, E.D. Pa. No. 01-6029.) *Chisom & Dixon* alleged that the "action [was] being filed as a class action on behalf of present and former African American employees who worked at Merck's facility in Whitehouse Station, NJ." (Compl. ¶ 7, E.D. Pa. No. 02-1196.) Finally, *Stith* alleged that the "action [was] being filed as a class action on behalf of present and former African American employees who work(ed) at Merck's facility in Rahway, NJ. (Compl. ¶ 7; E.D. Pa. No. 02-4176.)

---

[8] The "liability period" referred to in the complaints is not defined in the complaints, and Ferguson concedes that the liability period was a "broad allegation." He argues, however, that the proposed classes encompassing this time period included him. (*See* Pl. Surreply 4.)

According to both Ferguson and Merck, *Martin* was to be a class action based on employees of the Elkton, Virginia facility, even though the complaint itself contains broader class allegations.  Furthermore, as alleged in the complaints, *Chisom* proposed a class based on employees at Merck's Whitehouse Station, New Jersey facility, and *Stith* proposed a class based on employees at Merck's Rahway, New Jersey facility.  Ferguson concedes that he was not a putative member of these three proposed classes and instead argues that he was a putative member of the classes proposed in *Thompson*, *Rodgers*, and *Cates*.  (Pl. Surreply 3-5.)  He argues that as a putative member of three proposed classes, his claims continued to be tolled until the class allegations were struck from these complaints.

Merck argues that Ferguson was not actually a putative member of *Thompson*, *Rodgers*, and *Cates*.  Specifically, Merck contends that in opposition to Merck's motion to strike the class-based allegations from the complaints, the plaintiffs' attorneys argued that *Thompson*, *Rodgers*, and *Cates* were proposing smaller classes than those alleged in the complaints; *Thompson* was for Merck-Medco employees, and *Rodgers* and *Cates* proposed classes comprised of Merck sales representatives.  (*See* Def. Surreply 4 (citing Pl. Surreply, Decl. of Martin D'Urso Ex. A at 5-6).)  The complaints in *Thompson*, *Rodgers*, and *Cates* do not demonstrate that the plaintiffs' attorneys were proposing smaller classes in those cases, but Ferguson's exhibits demonstrate that in their briefs, the plaintiffs' attorneys did propose smaller classes than those alleged in those complaints.  (*See* Pl. Surreply, Decl. of Martin D'Urso Ex. A at 5-6.)

If smaller classes were proposed in *Thompson*, *Rodgers*, and *Cates*, Ferguson's argument that these cases continued to toll the statute of limitations on his claims fails because Ferguson was not a putative member of these classes; he was not a Merck-Medco employee or a sales

23

representative.  Even if the cases did not propose smaller classes, and instead proposed the broad

classes specifically alleged by the complaints, Ferguson's argument still fails because the

subsequently proposed classes were even broader than the class alleged in *Webb*.  Attempting to

certify classes that were even broader than the already denied class is an attempt to litigate an

already denied class claim and under Third Circuit precedent would not toll Ferguson's claims.

In conclusion, Ferguson's claims did not continue to be tolled until January 2004 because he

concedes he was not a putative member of the classes alleged in three of the complaints (*Martin*,

*Chisom & Dixon*, and *Stith*), and the other three complaints (*Thompson*, *Rodgers*, and *Cates*)

either proposed even broader classes than *Webb* or proposed smaller classes of which Ferguson

was not a putative member, and neither scenario entitles Ferguson to tolling.[9]

Finally, based on Third Circuit precedent, the statute of limitations would continue to be

tolled on Ferguson's claims until the second denial of class certification only if the first denial

was based on a deficiency in the class representative, rather than a deficiency in the class itself.

When determining whether class certification in *Webb* was denied because of class- or

representative-based deficiencies, the opinion as a whole must be evaluated.  *See Yang*, 392 F.3d

at 111.  Looking at the denial of class certification in *Webb*, it is clear that the court denied

---

[9] Ferguson additionally argues that there were subsequent discussions in which plaintiffs' attorneys asked Judge Weiner to consider certifying the *Webb* class based solely on employees at Merck's West Point facility, and this proposed class included Ferguson.  Merck responds that the plaintiffs' attorneys in *Webb* never sought reconsideration of the denial of class certification or sought leave to amend the *Webb* complaint to assert a class based solely on the West Point facility.  The *Webb* docket demonstrates that Merck's argument is correct; nothing in the *Webb* docket shows that there was an attempt to recertify a smaller *Webb* class or an attempt to certify a class limited to the West Point facility.  Thus, based on the record, there was no proposed smaller class based on the West Point facility and, therefore, no smaller proposed class of which Ferguson was a putative member.

certification because a class-based deficiency as to commonality resulted in the claims not being amenable to class action.[10]  *See Webb*, 206 F.R.D. 399.   The court found there was no commonality among the proposed class members, and the defenses Merck would raise would be unique to each plaintiff.  *See id.* at 404-06.   The court listed examples of the multiple factual differences between the class members and highlighted the lack of commonality before determining that the "factual disparities" among the class members were too great to be tried together.  *See id.*  Commonality is a defect in the class itself; therefore, it is a class-based deficiency that precludes using the subsequent cases from tolling the statute of limitations on Ferguson's claim.  *See Yang*, 392 F.3d at 104 (agreeing with line of cases that "refuse to toll limitations periods for substantively identical class actions in which the earlier putative class was denied certification because the substantive claims were inappropriate for class treatment").  Ferguson's argument that the statute of limitations did not begin running again until January 2004 is unavailing.  The statute of limitations on Ferguson's claim began to run on June 18, 2002, when the Third Circuit denied permission to appeal the final and adverse decision in *Webb*, which had denied class certification because of class-based deficiencies.

### 2.      Single-Filing Rule

Ferguson originally admitted he did not timely file his EEOC charge, but he argued that his Title VII claim was not time barred under the single-filing rule.  Ferguson acknowledges the Third Circuit has not applied the single-filing rule to an analogous case, but he argues that application of the rule is appropriate here because the principal functions of the filing

---

[10] The court also denied class certification for representative-based deficiencies, but for purposes of the current case, it is the independent denial predicated on class-based deficiencies that is relevant.

requirements, which are notice and an opportunity for reconciliation, were fulfilled by Green's timely filed EEOC charge.

Under the single-filing rule, a plaintiff who did not timely file an EEOC charge can join a class action without satisfying the exhaustion and filing requirements if the plaintiff who filed the class action filed a timely EEOC charge and alleged class-based discrimination in that charge. *Commc'ns Workers of Am.*, 282 F.3d at 217.  The Third Circuit's first opinions addressing the single-filing rule focused on the requirement of including class-based allegations in the EEOC charge in order for the rule to apply.  *See Lockhart v. Westinghouse Credit Corp.*, 879 F.2d 43, 52 (3d Cir. 1989) (determining that single-filing rule did not apply to opt-in plaintiffs because original, timely filed EEOC charge did not allege class-based discrimination), *overruled on other grounds by Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993); *Lusardi v. Lechner*, 855 F.2d 1062, 1078 (3d Cir. 1988) (determining that a timely EEOC charge filed by one plaintiff can be the basis for a class action lawsuit as long as it alleges class issues, which sufficiently put the defendants on notice and encourages meaningful conciliation).[11]  In later cases, the Third Circuit has emphasized that application of the single-filing rule is limited to plaintiffs who did not timely file an EEOC charge but seek to join a class action.  *See Commc'ns Workers of Am.*, 282 F.3d at 217-18; *Whalen v. W.R. Grace & Co.*, 56 F.3d 504, 507 (3d Cir. 1995).

Most recently, the Third Circuit addressed the issue of whether the single-filing rule

---

[11] Green's EEOC charge alleged "a 'pattern of racial discrimination and racial harassment' against him and other African-American employees that created a 'hostile work environment.'" *See Webb v. Merck & Co., Inc.*, 450 F. Supp. 2d 582, 593 (E.D. Pa. 2006) (quoting Green's EEOC charge).  Green's EEOC charge therefore included a potential claim brought by Ferguson.  Nonetheless, as discussed below, Ferguson cannot take advantage of these inclusive allegations because he is not an untimely plaintiff seeking to join a class or collective action.

applies to an untimely plaintiff when a class action was first certified but was then decertified after reconsideration.  *See Ruehl v. Viacom, Inc.*, 500 F.3d 375 (3d Cir. 2007).  The *Ruehl* court reviewed the Third Circuit's prior decisions on the single-filing rule and emphasized that it has only been applied in the limited context of untimely plaintiffs seeking to join class or collective actions.  *Id.* at 386-88.  The court declined to extend application of the single-filing rule to situations outside of the context in which it has already been applied.  *Id.* at 389-90.

Ferguson is not an untimely plaintiff seeking to join a class or collective action; he is pursuing his own individual claims.  The Third Circuit's continued limitation of the single-filing rule to contexts where an untimely plaintiff seeks to join a class or collective action precludes application of the single-filing rule to Ferguson's individual Title VII claim.[12]  Ferguson's Title VII claim is therefore untimely because, even when accounting for the tolling provided by *Webb*, he did not file his EEOC charge within 300 days of the last discriminatory action alleged in the charge.  *Accord E.E.O.C. v. Conectiv*, No. 05-3389, 2006 WL 1451527, at *4 (E.D. Pa. May 25, 2006) (declining to apply single-filing rule because plaintiff was only bringing individual claims and dismissing plaintiff's claims under Title VII as time barred).  I will grant Merck's motion for summary judgment on the Title VII claim, and judgment will be entered in favor of Merck and against Ferguson accordingly.

### B.     Timeliness of Ferguson's § 1981 Claim

Section 1981 claims are subject to a four-year statute of limitations.  *See Jones v. R.R.*

---

[12] Ferguson attempts to rely on reasoning from Second Circuit case law to support his argument that the single-filing rule should be applied to his case, but in *Whalen*, the Third Circuit rejected the Second Circuit's approach to the single-filing rule.  *See* 56 F.3d at 507.  In *Ruehl*, the Third Circuit reiterated its disagreement with the Second Circuit.  *See* 500 F.3d at 389.  Therefore, Ferguson's arguments based on the Second Circuit's reasoning are unpersuasive.

*Donnelley & Sons Co.*, 541 U.S. 369, 383 (2004). The statute of limitations period may be tolled by the filing of a federal complaint, but not by the filing of an EEOC charge. *See Johnson v. Ry. Exp. Agency, Inc.*, 421 U.S. 454, 465-67 (1975).

Ferguson filed his federal complaint on February 1, 2005. Merck argues all of the alleged incidents regarding the discriminatory actions of the Merck supervisors are time barred because they all took place prior to February 2001, but it concedes that *Webb* may have tolled the statute of limitations.[13] Ferguson argues that because of the tolling provided by *Webb* and the six other complaints with class-based allegations, even without application of the continuing violations doctrine, all of the alleged incidents that took place on and after February 22, 1996 are timely.

_____

[13] Merck briefly, and without support, argues that Ferguson's allegations regarding supervisors other than Murphy are untimely because these incidents were not alleged in the proposed *Webb* class action and Ferguson is therefore not entitled to tolling on those claims. I disagree. First, the *Webb* amended complaint alleged, inter alia:

> "25. Plaintiffs and the class members have been subjected to a continuous and pervasive pattern and practice of racial discrimination by Merck, in that Merck's supervisors, managers and officers have created, perpetuated and/or condoned a work environment that is hostile to Black employees, including the plaintiffs, and conducive to racial discrimination and harassment. For example, White supervisors and managers, and White employees with the knowledge of management, have made racially derogatory, demeaning and discriminatory statements to plaintiffs and other class members, and have taken other actions with respect to plaintiffs and the class members that were motivated by or in furtherance of racial discrimination or harassment."

*Webb*, 206 F.R.D. at 401 (quoting Am. Compl. ¶ 25). These broad allegations are not limited to Murphy's actions, and the allegations should have put Merck on notice of the claims regarding the additional supervisors to which Merck now objects. Second, if I were to find that the claims regarding supervisors other than Murphy are time barred because they were not specifically alleged in *Webb*, this would essentially mean that Ferguson had to file a separate, individual lawsuit while class certification in *Webb* was pending simply because not all of Ferguson's specific, individual claims were alleged in *Webb*. This result would be contrary to the reasons supporting *American Pipe* and *Crown, Cork & Seal* tolling—which are "promotion of efficiency and economy of litigation"—and would result in "a needless multiplicity of actions." *Crown, Cork & Seal*, 462 U.S. at 351.

As determined above, the existence of six complaints with class-based allegations did not

toll the statute of limitations on Ferguson's claims; therefore, the statute of limitations stopped

tolling on June 18, 2002, when the Third Circuit denied permission to appeal Judge Weiner's

final and adverse denial of class certification in *Webb*.  Ferguson's claims were, however, tolled

while class certification was pending in *Webb* because he was a putative member of the proposed

class.  Therefore, the statute of limitations period for Ferguson's § 1981 claim was tolled from

January 27, 1999 (when *Webb* was filed in federal court) to June 18, 2002.  Two years and 228

days passed between June 18, 2002 and the filing of Ferguson's complaint on February 1, 2005,

leaving one year and 137 days in the four-year statute of limitations period.  Counting back from

the January 27, 1999 filing date in *Webb*, even if the continuing violations doctrine is not

applicable, all alleged incidents that occurred after August 17, 1997 are within the statute of

limitations period and can be considered.  If the continuing violation theory is applicable,

however, all the incidents complained of by Ferguson can properly be considered.

The Third Circuit has noted that there is a natural affinity between a hostile work

environment claim and the continuing violations theory.  *See West v. Phila. Elec. Co.*, 45 F.3d

744, 755 (3d Cir. 1995).  Despite this natural affinity, the Third Circuit has declined to adopt a

per se rule that properly alleging a hostile work environment claim automatically constitutes a

continuing violation.  *Id.* at 755.  Thus, alleging a hostile work environment claim does not

suffice to apply the continuing violations doctrine, and Ferguson's claims must be analyzed in

order to determine whether the doctrine applies here.

The Third Circuit has laid out two requirements for establishing whether the continuing

violations theory is applicable to a claim.  First, the plaintiff must demonstrate that at least one

29

act occurred within the statute of limitations. *Id.* at 754; *see also Morgan*, 536 U.S. at 105 (holding "that consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period). Second, "the plaintiff must establish that the harassment is 'more than the occurrence of isolated or sporadic acts of intentional discrimination.'" *West*, 45 F.3d at 755 (quoting *Jewett v. Int'l Tel. & Tel. Corp.*, 653 F.2d 89, 91 (3d Cir. 1981)).

Merck argues the last alleged discriminatory act was the animal e-mail sent in August 1998. Ferguson contends the last act took place on December 6, 2000, when Bernard Willis forced him to enter the core. Both dates are well within the statute of limitations period, and Ferguson has therefore established the first prong.

The remaining issue is whether Ferguson has established "more than the occurrence of isolated or sporadic acts of intentional discrimination." *Id.* When considering this, "[t]he relevant distinction is between the occurrence of isolated, intermittent acts of discrimination and a persistent, on-going pattern." *Id.*. The factors to consider are (1) subject matter, or whether the acts constitute the same type of discrimination; (2) frequency; and (3) permanence, or whether the consequences of the actions would persist even without a continuing intent to discriminate. *West*, 45 F.3d at 755 n.9 (citing *Berry v. Bd. of Supervisors of La. State Univ.*, 715 F.2d 971, 981 (5th Cir. 1983)). A court must closely scrutinize the claims to ensure they are properly related. *Rush v. Scott Speciality Gases, Inc.*, 113 F.3d 476, 484-85 (3d Cir. 1997) (noting that the Third Circuit has "no intention of shredding the [statute of] limitations period by automatically allowing an employee who alleges actionable conduct occurring within that period to make

30

claims with respect to any adverse employment actions that occurred during his or her entire period of employment").

Merck argues that any allegations regarding Murphy's actions prior to 1998 are not part of a continuing violation because there is a lack of temporal proximity between the actions and because of a lack of similarity in the type of discrimination perpetrated, which are required by the first two factors. Regarding the other supervisors' actions, Merck argues they are random, disparate experiences spread out over a decade that are not similar, and there is no evidentiary support the supervisors were acting "in concert," which Merck contends is a requirement for the continuing violations theory.

Ferguson counters that under the standard set by the Supreme Court in *Morgan*, none of the alleged incidents are time barred because they are all part of a single hostile work environment claim. In his surreply, Ferguson reiterates that "his allegations against Merck were part of a campaign of race-based harassment and are therefore appropriately included in an assessment of the 'totality of the circumstances' as directed by *West*." (Pl. Surreply 8.) Further, Ferguson argues, whether the acts are temporally close or sufficiently related is a fact-based argument that should be resolved by a jury and is not appropriate for resolution when ruling on a motion for summary judgment.

As an initial matter, summary judgment is an appropriate time to consider whether the continuing violations theory applies and whether the acts are temporally close enough or sufficiently related to fall under the doctrine. *See, e.g.*, *Bronze Shields, Inc. v. N.J. Dep't of Civil Serv.*, 667 F.2d 1074, 1080-84 (3d Cir. 1981) (addressing applicability of continuing violations theory to plaintiff's employment discrimination claims after district court determined it did not

apply and entered summary judgment in favor of defendants); *Sicalides v. Pathmark Stores, Inc.*, No. 99-3465, 2000 WL 760493, at *4-6 (E.D. Pa. June 12, 2000) (analyzing applicability of continuing violations theory prior to granting defendant's motion for summary judgment on plaintiff's sexual harassment claims).

Considering the Supreme Court's decision in *Morgan*, the crucial inquiry in determining whether the acts are sporadic or are part of an ongoing pattern is whether the actions alleged were "discrete discriminatory acts" or whether they constitute a "hostile work environment."  536 U.S. at 110-121; *see also id.* at 105 (concluding that recovery is not permissible for "discrete acts of discrimination . . . that occur outside the statutory time period"); *id.* at 120 ("A court's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice . . . .").  This comports with the Third Circuit's determination that *West*'s third factor, permanence, is the most important factor to consider, *see Cowell v. Palmer Twp.*, 263 F.3d 286, 292 (3d Cir. 2001) (citing *Berry*, 715 F.2d at 981), because one consideration regarding permanence is whether the harassment "occurred consistently . . .[and] without respite" or if the harassment consisted of discrete events, such as a lost job or denied promotion, that "trigger[ed] a duty of the plaintiff to assert his rights arising from that deprivation," *see West*, 45 F.3d at 755-56.

The handling of the 1994 promotion of a white employee to the lieutenant position, Carroll not allowing Ferguson to use the phone in 1995 when his daughter was ill, Sloyer telling Ferguson he could not do the same things Sloyer could do during training in 1995, Murphy pushing Ferguson in 1995, and Murphy denying Ferguson access to Health Services when he was ill in 1996 were all discrete acts of which Ferguson was aware at the time they occurred.

32

Furthermore, these actions are the types of discrete events the Third Circuit has described as permanent.  Ferguson should have asserted his rights after these events because his belief that these actions deprived him of his rights triggered his duty to assert his rights when the events occurred.[14]

Analyzing *West*'s other two factors also leads to the determination that the continuing violations theory does not apply.  Regarding the first factor, subject matter, I question whether all of the actions Ferguson has complained of were sufficiently similar to be part of the same subject matter of his hostile work environment claim.  First, the promotion of a white employee to the lieutenant position in 1994 falls under the auspices of a failure to promote claim, not a hostile work environment claim; therefore, it is not part of the same type of discrimination.  *See Rush*, 113 F.3d at 484-85 (concluding that untimely failure to promote and train claims were not sufficiently related to sexual harassment claims and continuing violations theory did not apply); *Fala v. Perrier Group of Am.*, No. 99-3319, 2000 WL 688175, at *12 (E.D. Pa. May 25, 2000) (concluding that acts complained of were not part of same type of discrimination because they were "a mishmash of failure to promote claims and sexual harassment claims").  Second, some of the untimely incidents alleged, for example Carroll's yelling on different occasions in or around 1995 and Murphy's pushing in 1995, incidents that Ferguson admits did not include overt racial discrimination, are not sufficiently related to the more overtly racial "zookeeper" comments and animal e-mails to be part of the same subject matter.  *Cf. Sicalides*, 2000 WL

---

[14] Although I conclude these events were discrete acts that triggered Ferguson's duty to act, this determination in no way suggests that Ferguson could have successfully pursued claims based on these events; rather, it is a conclusion that because Ferguson felt these discrete acts violated his rights, these acts triggered his duty to attempt to pursue claims based on these incidents at the time they occurred.

760439, at *5 (determining that incident involving direct sexual touching was not sufficiently related to incident involving ambiguous comments and nonsexual "nudges," and these actions did not meet the same subject matter requirement of *West*).

As to the frequency factor, the Third Circuit has "never set a specific standard for determining how close together the acts must occur to amount to a continuing violation." *Cowell*, 263 F.3d at 295. Nonetheless, the Third Circuit has stated that the "type of acts that would satisfy the 'frequency' factor . . . must at least be acts of substantially similar nature as to those which were the basis of the original claim." *Id.* Additionally, the time gap between incidents and the number of incidents that occur are considered. In *West*, the Third Circuit found that the alleged racial harassment was frequent because it occurred consistently over a four-year period and occurred with increased frequency during the last year. 45 F.3d at 744. Similarly, in *Rush*, the sexual harassment was frequent because it was a continuous pattern of related behavior that increased in frequency and eventually occurred on a daily basis. 113 F.3d at 482-83. In contrast, in cases where the continuing violations theory has not been applied, there have been prolonged periods between discriminatory events, demonstrating that the alleged discrimination consisted of isolated or sporadic acts. *See, e.g.*, *Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 716 (3d Cir. 1997) (concluding that many factors surrounding plaintiff's claims, including a seven-month time gap between events, which provided "an opportunity for the lingering effects of the prior incidents to dissipate," suggested that the plaintiff was not subjected to hostile work environment); *Fala*, 2000 WL 688175, at *12 (determining that the plaintiff admitted there was no harassment during a ten-month period, and that alone destroyed continuity).

In this instant case, many of the dates of the actions Ferguson complains of are

34

ambiguous.  For example, some of the actions occurred "in 1995 or 1996," "beginning in 1996 or 1997," "between 1996 and 1998," and "in 1999 or 2000."  Thus, a determination as to an exact time gap between events is not feasible.  Nonetheless, the fact that a few incidents occurred each year over an eleven-year period[15] does not establish the type of frequency the Third Circuit has previously found establishes the requisite frequency.  The types of incidents that occurred were not repeated; rather, nearly every incident involved a different type of action.  Additionally, there is no evidence that the frequency of harassment Ferguson complained of increased over time, which may have excused Ferguson's failure to file a complaint earlier.  Finally, although there may have been some overlap in the actions, for the most part they were perpetrated by independent supervisors that acted independently over different time periods, which demonstrates isolated events rather than a persistent, ongoing pattern over the entire eleven-year period.  *Accord Wilkins v. ABF Freight Sys., Inc.*, No. 03-6610, 2005 WL 2271866, at *4 (E.D. Pa. Sept. 15, 2005) (concluding continuing violations doctrine did not apply because there was no legal connection between actions by two different supervisors that acted independently during two different time periods).  Thus, the actions did not occur with the requisite frequency.[16]

---

[15] Ferguson's alleged incidents encompass eleven years, from the filling of the security guard position in 1994 to Grofic's alleged harassment in 2005.

[16] When he submitted his surreply, Ferguson attached fifteen affidavits prepared by other Merck employees in 2002 and 2003.  The affidavits described incidents involving these employees and allegedly demonstrate a hostile work environment at Merck.  Ferguson argues these affidavits should be considered when determining whether the actions Ferguson has complained of were sufficiently similar and occurred with temporal proximity.  Merck argues the affidavits cannot be considered because they are brought in too late, but that even if considered, they do not establish a continuing violation.  I agree with Merck that the incidents complained of in the affidavits do not show a continuing violation.  The affidavits do not provide the dates during which many of the alleged incidents occurred, precluding a determination they occurred frequently, and many of the incidents described were discrete acts.  Thus, they do not

In conclusion, the untimely actions Ferguson has complained of do not demonstrate a persistent, ongoing pattern.  The untimely actions constituted discrete acts that triggered Ferguson's duty to assert his rights at the time the alleged events occurred.  The actions were not all part of the same subject matter, they did not occur frequently enough over the eleven-year period, and some of them were discrete actions that triggered Ferguson's duty to assert his rights at the time of the alleged violations.  Ferguson's allegations of harassment by various supervisors over an eleven-year period do not constitute a "continuing violation" of harassment as a matter of law.  Therefore, only the incidents that took place after August 17, 1997 can properly be considered as a basis for liability.

### C.      42 U.S.C. § 1981 Racially Hostile Work Environment Claim

In order to prove a *prima facie* case for a hostile work environment claim under 42 U.S.C. § 1981,[17] Ferguson must establish that (1) he suffered intentional discrimination because of his race, (2) the discrimination was severe or pervasive, (3) it detrimentally affected him, (4) it would have detrimentally affected a reasonable person of the same protected class in his position,

---

demonstrate a continuing violation.

[17] The relevant provisions of 42 U.S.C. § 1981 provide:
> (a) Statement of equal rights.  All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
> (b) "Make and enforce contracts" defined.  For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

36

and (5) there is a basis for respondeat superior liability.[18]  *Aman v. Cort Furniture Rental Corp.*,

85 F.3d 1074, 1081 (3d Cir. 1996).  In short, Ferguson must show "by the totality of the

circumstances, the existence of a hostile or abusive *environment* which is severe enough to affect

the psychological stability of a minority employee."  *Aman*, 85 F.3d at 1081 (citing *Andrews v.*

*City of Phila.*, 895 F.2d 1469, 1482 (3d Cir. 1990); *Vance v. S. Bell Tel. & Tel. Co.*, 863 F.2d

1503, 1510 (11th Cir. 1989)).

　　As discussed in the preceding section, the timely aspects of Ferguson's hostile work

environment claim took place from 1997 to 2005 and include the following incidents:  (1)

Murphy marking unclean masks employees would wear into the core as clean, (2) Murphy

denying Ferguson's request to be able to schedule overtime when Ferguson was the shop

steward, (3) Murphy's "zookeeper" comments, (4) Murphy's animals e-mail, (5) Merck denying

the LMCs' request for a labor grade and pay increase, (6) the placement of KKK flyers on five

employees' vehicles in Merck's parking lot,[19] (7) discipline taken against African American

employees when they were acting pursuant to their white supervisors' directives, (8) Merck's

refusal to consider seriously Ferguson's complaint regarding "loose conduct" in his building and

the cleanliness of the building, (9) Willis forcing Ferguson and other workers to enter the core

when Ferguson believed it might not be clean, (10) Merck's refusal to investigate why Ferguson

---

[18] The Third Circuit initially set forth these factors in the context of a Title VII claim, but the same analysis applies to Ferguson's § 1981 racially hostile work environment claim.  *See Ocasio v. Lehigh Valley Family Health Center*, 92 F. App'x 876, 879 (3d Cir. 2004); *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999).

[19] Ferguson has not provided the exact date on which KKK flyers were placed on vehicles at Merck, but he testified that it took place in 1997.  Viewing this incident in the light most favorable to Ferguson, I will assume for purposes of deciding the summary judgment motion that this event took place after August 17, 1997 and is timely.

was accidently overpaid $400 in a paycheck, (11) Grofic's comment to Ferguson that "you people" are paid too much in comparison to the education levels, and (12) Grofic questioning Ferguson about leaving work early.  Merck argues there was no intentional racial discrimination, and even if the discrimination was intentional and racial, it was not pervasive or severe, and a reasonable person would not have been detrimentally affected by the discrimination.

First, in order to demonstrate intentional discrimination due to race, a plaintiff is not required to present direct evidence of his harasser's motivation for discrimination against him. *Abramson v. William Paterson Coll.*, 260 F.3d 265, 278 (3d Cir. 2001).  Nor is a plaintiff required to prove that his harasser's intent was to create a discriminatory environment.  *Id.* Rather, because "discrimination is 'often simply masked in more subtle forms,'" the intent to discriminate can be inferred from circumstances that demonstrate race was a substantial factor in the discrimination.  *Aman*, 85 F.3d at 1082; *see also Andrews*, 895 F.2d at 1482; *Abramson*, 260 F.3d at 278.  "Regardless of what a harasser's intention is, if a plaintiff presents sufficient evidence to give rise to an inference of discrimination by offering proof that [his] 'workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,'" and the conduct is based on a protected category, "a hostile work environment claim will survive summary judgment."  *Abramson*, 260 F.3d at 279 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  This determination must be made not by looking at each incident of harassment in isolation, but by looking at all of the events in the aggregate.  *Id.* at 279-80 (citing *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 155 (3d Cir. 1999)).

Merck argues Ferguson has not shown any evidence of intentional discrimination based

on race regarding Murphy's actions or the actions of any of the other supervisors.  Viewing the facts in the light most favorable to Ferguson, I disagree.

Ferguson admits that the primary basis for his claim stems from Murphy's animals e-mail and Murphy referring to himself as the "zookeeper."  The references that Murphy was a "zookeeper" of an African American crew, and Murphy referring to his African American charges as "my animals," could be interpreted as embodying racial animus.  The Third Circuit has found that the use of "code words," such as those used here, can create a hostile work environment.  *See Aman*, 85 F.3d at 1083 (holding that a reasonable jury could determine that words such as "another one," "one of them," "that one in there," and "all of you" were spoken with the intent to discriminate).  Indeed, a reasonable jury could conclude that an intent to discriminate was implicit in Murphy's comments.[20]

Even if Ferguson can prove the actions complained of were motivated by racial animus, Merck argues the actions were not severe or pervasive.  In order to determine whether conduct is sufficiently severe or pervasive, it is necessary to consider the "totality of the circumstances."

---

[20] Some of the other actions do not demonstrate discriminatory animus on the basis of race because they do not show that Ferguson, or other African Americans, were treated differently from whites.  *See Aman*, 85 F.3d at 1082 (finding that intentional discrimination because of race existed because African American employees were subjected to false accusations and ordered to do menial tasks, but white employees were not subjected to the same treatment).  For example, Ferguson complained that in 2000, Willis threatened him with insubordination if he did not enter the core, despite Ferguson's contention that the core had not been properly cleaned and tested after having been found to have a high reading of chemicals.  Ferguson admitted that another white employee was also required to enter the core with him at the same time, and that Willis himself, who is white, entered the core with Ferguson and the other employee.  Similarly, Ferguson admitted that African Americans and whites alike complained of Grofic's treatment of them, showing that she dealt harshly with employees of both races.  Nonetheless, because some actions do imply intentional racial discrimination, the overall claim will survive a motion for summary judgment.

*Andrews*, 895 F.2d at 1482.  A hostile work environment analysis must therefore "concentrate

not on individual incidents, but on the overall scenario."  *Id.* at 1484.  Furthermore, the Third

Circuit has recognized that "the advent of more sophisticated and subtle forms of discrimination

requires that we analyze the aggregate effect of all evidence and reasonable inferences therefrom,

including those concerning incidents of facially neutral mistreatment, in evaluating a hostile

work environment claim."  *Cardenas v. Massey*, 269 F.3d 251, 262 (3d Cir. 2001).

Simple teasing, offhand comments, and isolated incidents generally do not amount to an

actionable employment discrimination claim.  *See Faragher v. City of Boca Raton*, 524 U.S. 775,

788 (1998).  Looking at the totality of the circumstances, however, a reasonable jury could find

that the harassment in this case was sufficiently pervasive or severe.  Viewing the evidence in the

light most favorable to Ferguson, his white supervisor, who oversaw an all-African American

crew, referred to himself as a "zookeeper," referred to the employees reporting to him as

"animals" needing to be closely watched, and told other supervisors not to feed his charges any

"raw meat" because he "had a heck of a time getting them back on a dry food diet the last time."

Additionally, Ferguson was not allowed to take on responsibilities that had been given to a white

employee when he assumed that employee's duties, his request to increase the labor grade of an

African American crew was denied while a white crew's labor grade was increased, and

Ferguson observed other African American employees being subjected to harassment.  Given this

pattern of behavior, I find that a reasonable jury could determine that this conduct is sufficiently

abusive, humiliating, and intimidating to constitute severe or pervasive harassment.

None of the three briefs filed by Merck in support of its motion for summary judgment

addresses the third element of a hostile work environment claim, which is whether Ferguson has

established that the discrimination he complains of detrimentally affected him.  Ferguson

summarily states that he has "extensively testified to the harm he suffered as a result of the

hostile work environment at Merck." (Pl. Mem. in Opp. to Def. Mot. for Summ. J. 22.)  He does

not, however, provide a single citation to any of this extensive testimony.  Ferguson also alleges,

but again does not point to evidence to support his claim, that his heart condition was

exacerbated by his workplace environment.  (*Id.*)  Nonetheless, during his deposition, Ferguson

stated that he was upset after the August 1998 meeting and hearing about Murphy's e-mails.

(Ferguson Dep. 405:18-406:17.)  In fact, he was a part of the group that requested a meeting with

directors to discuss the e-mail, and he himself drafted the grievance the employees filed after the

e-mail incident.  (*Id.* at 403:11-21, 408:8-23.)  Evaluating this in the light most favorable to

Ferguson, I conclude that a genuine issue of material fact exists as to whether Ferguson was

detrimentally affected by the discrimination.

Regarding the objective prong, Merck argues that Ferguson fails to demonstrate that a

reasonable person in his position would have been detrimentally affected by the complained of

actions.  Merck contends that "'over-sensitivity to the rough and tumble of the workplace'" does

not demonstrate that a reasonable person would be detrimentally affected by the alleged

incidents.  (Def. Mem. in Support of Mot. for Summ. J. 25 (quoting *Waite v. Blair, Inc.* 937 F.

Supp. 460, 469 (W.D. Pa. 1995).)

In determining whether Ferguson meets his burden on this element, the court must

"look[] at all the circumstances.  These may include the frequency of the discriminatory conduct;

its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

whether it unreasonably interferes with an employee's work performance." *Abramson*, 260 F.3d

41

at 280 (quoting *Harris*, 510 U.S. at 23).  In this case, the conduct could be viewed as beyond

"simple teasing, offhand comments, and [nonserious] isolated incidents."  *Faragher*, 524 U.S. at

788.  Here, twenty-seven employees signed the petition and grievance with regard to Murphy's e-

mail.  This, as well as the facts set forth above, leads me to conclude that Ferguson has made a

sufficient showing that a jury could find that a reasonable person of his race would find the

conduct alleged to be so harmful that it altered his working conditions.

Merck also does not address the fifth element of a hostile work environment claim, which

is the plaintiff must demonstrate the employer is vicariously liable for the acts of its employees.

Agency principles are used in this determination, and "'liability exists where the defendant knew

or should have known of the harassment and failed to take prompt remedial action.'"  *Andrews*,

895 F.2d at 1486 (quoting *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1316 (11th Cir.

1989)).  Ferguson argues Merck is vicariously liable because he complained of and filed

grievances, but Merck did not take action to alleviate the hostile work environment claim.

Merck has not countered and has not shown there is no genuine issue of material fact on the issue

of vicarious liability.

Genuine issues of material fact remain on Ferguson's § 1981 hostile work environment

claim.  I will therefore deny Merck's motion for summary judgment on Ferguson's § 1981 claim.

**IV.    Conclusion**

Ferguson's EEOC charge was not timely filed, and his Title VII claim is therefore barred.

Merck's motion for summary judgment will be granted as to the Title VII claim, and judgment on

the Title VII claim will be entered in favor of Merck and against Ferguson.  Merck has not met

its burden of showing that there is no genuine issue of material fact, and Merck is not entitled to

42

judgment as a matter of law for the § 1981 claim for a hostile work environment.  I will therefore

deny Merck's motion for summary judgment as to the § 1981 claim.

       An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| | : | |
| EDWARD FERGUSON and | : | |
| ANTHONY GREEN, | : | CIVIL ACTION |
|   Plaintiffs, | : | |
| | : | NO. 05-0451 |
|     v. | : | |
| | : | |
| MERCK & CO., INC., | : | |
|   Defendant. | : | |

## Order

YOHN, J.

      AND NOW on this _____ day of January 2008, upon consideration of defendant's

motion for summary judgment (Docket No. 21), plaintiff's response, defendant's reply,

plaintiff's surreply, and defendant's surreply thereto, IT IS HEREBY ORDERED that:

      1.     Merck's motion for summary judgment as to Ferguson's Title VII claim is
GRANTED.  Judgment is entered in favor of Merck and against Ferguson on
Ferguson's Title VII claim.

      2.     Merck's motion for summary judgment as to Ferguson's § 1981 claim for a
hostile work environment is DENIED.

      3.     Trial on the remaining claims of Edward Ferguson and Anthony Green is
scheduled for April 7, 2008 at 10:00 a.m.

                                         __s/William H. Yohn Jr.__
                                       William H. Yohn Jr., Judge